

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Mr. Wallace Hughston, Director
Motor Transportation Division
Railroad Commission of Texas
Austin, Texas

Dear Mr. Hughston:

Opinion No. O-5385
Re: Whether The Butane
Company is a Motor
Carrier.

You inquire whether The Butane Company of Brownwood is a motor carrier, subject to the regulations of the Railroad Commission under the Texas Motor Carrier Act, Article 911b, V. A. C. S.

It has been necessary to supplement the information furnished us by you. This we have done by conference and correspondence with Mr. Sterling Holloway, counsel for The Butane Company.

You enclosed a letter from Mr. George E. Hughes, your Law Enforcement Officer, which reads, in part, as follows:

"Pursuant to your request, I submit below a detailed statement of our findings so far in our investigation of the operation of The Butane Co., of Brownwood, Texas.

"1. As to the particular case filed at Dayton, Texas, on May 13, 1943, against D. Vaughan, driver of a truck owned by the Butane Co., of Brownwood, Texas, our investigation discloses the following:

"a. 2265 gallons of commercial butane was transported from Baytown, Texas, to Port Arthur, Texas. A copy of the Railroad Commission of Texas Motor Vehicle Manifest taken from the files of the Oil and Gas

Mr. Wallace Hughston, page 2

Division of the Railroad Commission of Texas office at Houston, shows the shipper of this cargo to have been Humble Oil and Refining Co., Baytown, Texas, and the consignee of the shipment to have been the White Gas Co., Port Arthur, Texas, and that shipment was made by truck owned by the Butane Company of Brownwood, Texas, driven by D. Vaughan.

"b. An examination of the records of the White Gas Co., Port Arthur, Texas, show that this load of Butane was purchased by the White Gas Co. from Anchor Petroleum Corporation of Tulsa, Oklahoma, and that payment for same was made to the Anchor Petroleum Co., of Tulsa, Oklahoma, indicating to us that The Butane Company of Brownwood, Texas, was not involved in the transaction in any manner except as the transportation agent.

"2. The same facts as to manifests, contracts, purchases and payments apply to a number of other cases involving the Farmers Butane Gas Company of Houston; Winton Automatic Gas Company, Beaumont, Texas; Automatic Gas Co., of Beaumont, Texas; and the Crown Central Petroleum Corporation, Pasadena, Texas.

"3. The records of the Geir-Jackson Recycling Plant at Grapeland disclose that the entire output of this plant is contracted to the Anchor Petroleum Co., Tulsa, Oklahoma, and that a large majority of the gas from this plant is transported to the Gulf Oil Corporation at Port Arthur, Texas, in trucks owned by The Butane Company of Brownwood. Mr. Higginbotham, of the Gulf Oil Corporation, advised one of our inspectors that they had a contract with the Anchor Petroleum Company, Tulsa, Oklahoma, for the gas from Geir-Jackson Recycling Plant and did not know the Butane Company in connection with the contract. He further stated that the Gulf Oil Corporation is invoiced by the Anchor Petroleum Company and that such invoices are paid to the Anchor Petroleum Company.

"4. One of our inspectors has checked the records of the Distillate Production Corporation and these disclose a contract by and between Distillate Production Corporation and the Anchor Petroleum Corporation, wherein it is contracted that Distillate Production Corporation agrees to sell and deliver to Anchor Petroleum Corporation from Distillate Production Corporation tanks at the loading dock into tank trucks to be furnished by Anchor Petroleum Corporation. Products under this contract are being delivered by The Butane Company of Brownwood to the Crown Central Petroleum Corporation at Pasa-

dena, to storage of that corporation.

"5. In the records of the Distillate Production Corporation, our inspector examined a letter addressed by the Anchor Petroleum Corporation to Distillate Production Corporation which read as follows: 'As to trucking equipment for Liquefied Gas Products, we believe that our company owns or has more equipment available than any other concern. This equipment includes one large new propane transport, having a working pressure of 200 lbs. and a capacity of 4,000 gallons which we contemplate using. Our trucking facilities together with those of a large trucking concern in the State of Texas, with whom we have a close working arrangement, approximate 75,000 gallon capacity.'

"6. The Anchor Petroleum Corporation is an Oklahoma Corporation and has a permit to do business in Texas. Nothing in the files of the Secretary of State's office show any connection between the Anchor Petroleum Corporation and The Butane Co., of Brownwood.

"7. The charter of the Butane Company of Brownwood has been cancelled according to records of the Secretary of State.

"In conclusion, our investigation discloses that the products transported by The Butane Company of Brownwood are products that have been purchased from various concerns by the Anchor Petroleum Corporation, that the purchasers of these products are invoiced by the Anchor Petroleum Corporation, and that payment is made to the Anchor Petroleum Corporation. The manifests covering these truck shipments are made by the producer to the Anchor Petroleum Corporation and that the Butane Company of Brownwood is not known or recognized other than as the transportation agent. * * *"

Mr. Holloway has made the following explanation of the activities of The Butane Company and the Anchor Petroleum Company, its associate:

Mr. Thurman Cole does business under the name of The Butane Company and is engaged in buying, selling and transporting Butane gas. A few years ago when he entered this business butane gas was a by-product of oil refineries; its

Mr. Wallace Hughston, page 4

production was irregular and the demand therefor fluctuated with the weather. At times the refineries would have a surplus and would shoot it into the air; on other occasions, when a local distributor would send his truck for a load the refinery would have none. Mr. Cole by contracting in advance with a large number of refineries and securing the business of a large number of local dealers, has been able to spread supply and demand, guaranteeing to refiners minimum sales and to local dealers a regular supply.

The Butane Company has storage in several West Texas towns and in others. It sells to dealers having their own storage. The price to the customers is based on the cost of the product to The Butane Company plus the cost of transportation, which varies with the distance. Whenever the local dealer sends his own truck to the refinery for gas, which he buys through The Butane Company, he receives a reduction in price based upon the company's saving on the cost of transportation.

The foregoing operations are carried on by The Butane Company by itself.

### JOINT OPERATIONS OF THE BUTANE COMPANY AND THE ANCHOR PETROLEUM COMPANY

In addition to the business carried on by The Butane Company in West Texas, it also carries on an extensive business jointly with the Anchor Petroleum Company, an Oklahoma corporation with a permit to do business in Texas. Principally, this business is carried on in this way:

Mr. Baten, for and in the name of Anchor Petroleum Company, contracts for the purchase of butane from a refinery and, usually later, for its sale to a dealer. The contract is actually for the joint account of Anchor and The Butane Company, but only the name of the Anchor Petroleum Company is known to the refiner and the dealer. Anchor operates no butane trucks in Texas; The Butane Company operates some thirty such trucks. All expenses of the transactions such as costs, purchase, sale, and transportation, are kept in a joint account. The total expenses are deducted from the receipts from sales and the resulting profit or loss is equally shared. Sometimes Mr. Cole of The Butane Company does the buying himself. In either event, the contract for the purchase or sale is entered into by Anchor or The Butane Company only after securing the advice and consent of its associate. Such approval is usually given by long distance telephone. The telephone bill of The Butane Company runs $300 or $400 per month.

Storage tanks are owned jointly by the confederates at several points, while other storage facilities are owned by one company or the other. However, as far as the joint account is concerned all plants are owned and operated by the joint account.

An exception to the procedure of securing advance approval of both associates for each contract appears to exist in Laredo where the superintendent of the jointly operated terminal makes sales without securing separate approval for each transaction.

## QUESTION

The question is whether under the foregoing facts The Butane Company is operating trucks for compensation or hire. If it is, it is a motor carrier.

Counsel for The Butane Company bases his contention that it is not a motor carrier upon the following parts of the Texas Motor Carrier Act, V. A. C. S., Article 911b, Section 1a:

"(1) Provided, however, that the term 'Motor Carrier' and the term 'Contract Carrier' as defined in the preceding section shall not be held to include:

"* * *

"(c) Where merely incidental to a regular, separate, fixed and established business, other than a transportation business, the transportation of employees, petroleum products, and incidental supplies used or sold in connection with the wholesale or retail sale of such petroleum products from the refinery or place of production or place of storage to the place of storage or place of sale and distribution to the ultimate consumer, in a motor vehicle owned and used exclusively by the marketer * * *"

In our view, transportation of butane for the joint account is not "merely incidental to a regular, separate, fixed and established business, other than a transportation business." If the transportation for the joint account were isolated, occasional, irregular, casual and desultory, (Annotations, 125 A. L. R. 229), The Butane Company might not be acting as a carrier; but where, as here, it employs some thirty trucks intensively in transporting for the joint undertaking, where such business is so extensive as to require several hundred dollars telephone calls a month for the coordination of the operation of the two companies, we are impelled to the view that the transportation is not "merely incidental" to a business "other than a transportation business" but that as to the joint operation the principal business of The Butane Company is that of transportation.

In our view the transportation is for compensation, notwithstanding the fact that the extent of the remuneration is uncertain and contingent upon profits. If the opposite were true, a truck operator might engage to transport for any number of concerns and be free of the supervision of the Railroad Commission as long as his compensation was a percentage of contingent profits. This would utterly destroy all attempts of the State to maintain uniform freight rates.

Counsel for The Butane Company has also suggested that The Butane Company may fall within the statutory exception, reading:

"(d) Any utility company using its own equipment transporting its own property over the highways."

Pretermitting the question of whether it is a utility, The Butane Company does not fall within this section, for in the joint operation it does not own the gas it transports, but at best has an undivided interest therein. This lack of ownership prevents his falling within exception (a) of the same subsection.

It is our opinion that you acted properly in filing a complaint against the driver of The Butane Com-

mr. Wallace Hughston, page 7

pany for operating without a permit from the Railroad Commission.

Our opinion file contains additional information on the activities of these companies. Kindly call on us if you require it.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By David W. Heath
David W. Heath
Assistant

DWH:EP

APPROVED AUG 24, 1943

Gerald C. Mann

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY [signature]
CHAIRMAN